UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:17-cv-232-JLB-MRM

PROPHET PAULCIN,

        Plaintiff,

v.

WEXFORD HEALTH SOURCES,
INC., JOHN D. WILLIS, KARA R.
WILLIAMS, JAMES LICATA,
JONATHAN T. REID, J.
BRUSSELL, JELANI POLICARD,
STEPHEN J. MATTEWSON, JR.,
KAREN BLANKENSHIP, ANDRES
OZUAL, CAROLYN NIES, C.
JOHNSON, and JULIE JONES,

        Defendants.
_____/

**DEFENDANTS' WEXFORD HEALTH SOURCES, INC.
RESPONSE IN OPPOSITION TO PLAINTIFF'S SECOND AMENDED
MOTION TO COMPEL BETTER ANSWERS [DE 167]**

Defendants, WEXFORD HEALTH SOURCES, INC. ("Wexford") files this

its Response in Opposition to Plaintiff's Second Amended Motion to Compel

Better Answers [DE 167] as follows:

**I. Background**

Plaintiff is an inmate in the Florida Department of Corrections serving a 30

year sentence for multiple counts of armed robbery, along with a 15 years sentence

for aggravated battery on a fellow prisoner and possession of contraband he earned while serving his robbery sentence. In this case, Plaintiff claims that he was involved in two separate stabbing attacks at Charlotte CI (January 29, 2017 and April 26, 2017) after which he received inadequate medical care by Wexford's employees, (the "Individual Medical Defendants:" Dr. Andres Ozual;  Karen Blankenship, ARNP; and Carolyn Nies, RN). Plaintiff claims that Defendant, Wexford Health Sources, Inc. ("Wexford") had a nationwide corporate policy to provide prisoners with as little medical care as possible, as late as possible, in order to maximize profits. Collectively, Wexford and the Individual Medical Defendants are referred to herein as the "Wexford Defendants."

Before the Court is Plaintiff's Second Amended Motion to Compel Better Answers from Defendant Wexford Health Sources Inc. ("Motion") [DE 167]. Plaintiff has taken exception to most every one of Wexford's discovery respones. In consideration of Plaintiff's Motion, the Court must keep in mind that Plaintiff's counsel and the Wexford Defendants' counsel conferred at length prior to Plaintiff's seeking the Court's intervention.  Additionally, deliberate indifference cases make up the majority of both counsels' practice and the two have litigated over similar discovery issues in other cases. This is not to insert any *ad hominem* argument to the instant Response in Opposition. Rather, it is to inform the Court that the basis of Wexford's repeated objections of irrelevance, overbreadth, and

outside the scope of discovery are no mystery to Plaintiff's counsel, but are well-known "battle lines" for both.

## II. Wexford's Response in Opposition

### A. Defendant, Wexford's Responses to Plaintiff's Interrogatories

Plaintiff served Wexford with 18 interrogatories ("Questions"). Plaintiff now argues that Wexford has not provided sufficient answers to Questions 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, or 16:

> 2.   Please give the starting and ending dates of the contract between Wexford and the Florida Department of Corrections (FDC) for medical and mental health care services at Charlotte Correctional Institution (Charlotte C.I.), the per capita, per diem rate for health care services during that time, indicating any changes and the date they took place, and describe in detail the circumstances under which the contract was terminated and the results of any appeal.

> 3. Please identify the ultimate policy maker for health care policies at Charlotte C.I. from 5/5/2015 through the end of the Wexford contract with FDC, by full name and title, indicating any changes during that time frame by the date and the nature of the changes.

> 4. Please identify by full name and title each person who reported directly to the aforementioned ultimate policy maker from 5/5/2015 through the end of the Wexford contract with FDC, by full name and title, indicating any changes during that time frame by the date and the nature of the change.

> 5. Please identify any persons who have been designated by the ultimate policymaker to make policy decisions within a discrete area of inmate medical and mental

health care from 5/5/2015 through the end of the Wexford contract with FDC, by full name and title, indicating any changes during that time frame by the date and the nature of the change.

6. Please describe in comprehensive detail the characteristics of the increases in inmate deaths at Charlotte C.I. during 2015 through 2017, listing and explaining the factors that gave rise to the increase in inmate deaths during this period, how the increase in deaths relates to medical and mental health care at Charlotte C.I. during that time frame, whether any studies of the causes or effects of the higher death rate were made, and the identity of a person able to testify competently as to those issues.

7. Please describe in comprehensive detail what changes have occurred in the nature and severity of injuries from inmate-on-inmate assaults at Charlotte C.I. during the Wexford contract with FDC, any changes in the frequency of mortality from such assaults, identify any authoritative studies of inmate-on-inmate assault injuries and name a person by full name and title who is best qualified to comment on such injuries from a medical standpoint.

8. Please describe in comprehensive detail the protocol for documentation and treatment of stab wounds in inmate-on-inmate assault, and what effort is made to notify prison security of the appearance of such wounds for investigative purposes, including any forms or communications, including e-mails, that are involved in documenting such incidents.

9. Please identify each physician (indicating whether the physician was the Chief Health Officer), each ARNP, each Physician's Assistant, each Health Services Administrator, and each Director of Nursing, to be employed by Wexford at Charlotte C.I. during 2015 to the end of its contract with FDC, by full name and

license number, indicating the beginning and ending dates of their employment and whether they were full-time or part-time.

10. Describe in comprehensive detail Wexford's protocol for treatment of stab wounds, including photographing such wounds and indicating not just the outside dimensions but also the depth of such stab wounds and for determining whether the wounds are contaminated, whether cultures are taken, and how the protocol is documented, including forms and e-mails and to whom such communication and documentation is distributed, and how such records, including photographs, are maintained and identify the custodian.

11. Please describe how questions relating to inmate health care grievances were handled by prison or medical staff during 2015 through 2017, including to whom they were circulated, whether to: a medical administrator, the medical staff named in the grievance, to central office staff; and the format in which they were circulated, including e-mail, and whether medical records were conveyed along with any communication relating to the grievance.

12. Please describe in full detail how stab wounds are treated within the hairline – describe whether and how wound sites are shaved to provide better visual assessment or describe any other procedure that is used to get better visuals of the wounds.

16. The attached Corrections Medical Authority (CMA) surveys (Exhibit 3a-d) were done at Charlotte C.I. on April 1-2, 2015 (3a); at Dade C.I. on November 17-19, 2015 (3b); and at Martin C.I. on November 13-14, 2013 (3c) and July 12-14, 2016 (3d). Please describe in comprehensive detail what was done to remedy the

inadequacies at those facilities of the conditions that were found to require corrective action.[1]

## Question 2

In question 2, Plaintiff seeks specific information regarding the Wexford/ FDOC contract including dates of the contract, pricing information, and circumstances regarding termination of the contract. Wexford objected only to the pricing information and the circumstances under which the contract was terminated based on relevance and scope of discovery. Wexford did provide Plaintiff with the FDOC's Termination Letter which terminated the Wexford/ FDOC contract, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. Plaintiff argues that pricing information is relevant because the Third Amended Complaint "alleges a nationwide policy of withholding care from prisoners on the basis of cost." [DE 167 at p. 2].   Specifically, Plaintiff alleges, "Wexford. . . has a nationwide corporate policy to provide prisoners with as little care as possible as late as possible in order to maximize profits." [DE 31 at ¶118a].

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Rule 401, Federal Rules of Evidence. How much Wexford was paid, per patient, per day (a) does not have any tendency to make this allegation more or less probable—Plaintiff offers no correlation between how

---

[1] Plaintiff  has not attached any of the referenced exhibits as exhibits to his Motion.

much Wexford was paid and any alleged denial of care based on cost—there is none. Further, (b) in the context of the facts of this case, we know definitively that the Wexford Defendants did not withhold care based upon cost. As argued in their Motion for Summary Judgment, Plaintiff was evaluated and treated for every medical issue with which he presented. See [DE 133 at p. 11-18].

As far as circumstances surrounding contract termination, pursuant to Rule 33(d), Federal Rules of Civil Procedure, Wexford produced the contract termination letter which sets forth the reasons for termination and is the definitive, legal notice document on the reasons FDOC terminated the Contract, as required by the Contract.

**Question 3, 4, 5**

In questions 3, 4, and 5, Plaintiff seeks identification and information regarding an "ultimate policy maker for health care policies at Charlotte CI." Wexford objected that the questions were vague and confusing insofar as no such "ultimate policy maker," to Wexford's knowledge exists, aside from FDOC itself. More specifically, Wexford was contractually bound to follow the policies set forth by FDOC's Health Services Bulletins (HSB's). These HSB's dictate how Wexford treats FDOC's inmate/ patients. The HSB's are developed through many, many layers of state bureaucracy which include committee input from various sources depending upon the specific issue the HSB addresses. Plaintiff argues in his

Motion to Compel that "the ultimate policymaker sought is a person, not an entity."  [DE 167 at p. 3]. Wexford is unaware of any one person who is the "ultimate policy maker."  As such, Wexford is not able to provide better answers to these questions.

**Questions 6, 7**

In questions 6 and 7, Plaintiff seeks from Wexford a description "in comprehensive detail of the increase in inmate deaths at Charlotte CI during 2015 through 2017" and "what changes have occurred in the nature and severity of injuries [and mortality] from inmate-on-inmate assaults at Charlotte CI during the Wexford contract" respectively. Wexford objected to both question on the grounds of relevance and being outside the scope of discovery.

As to question 6, relating to increase in inmate deaths, Plaintiff argues the information is relevant because "Wexford is being sued for systemic failure to provide constitutionally-mandated health care. A potential outcome of insufficient healthcare is an increase in deaths." [DE 167]. We must, however, view this within the context of the facts of this case. We know definitively that Plaintiff did not die as a result of his alleged insufficient healthcare in this case. In fact, we know definitively that Plaintiff didn't even develop infection or any complications whatsoever from his tiny (measured approximately 1 centimeter) scalp laceration. See Plaintiff's Medical Records filed under seal; see also Expert Affidavit of Dr.

Fowlkes, generally, and specifically ¶31, filed under seal. Further, does not even allege he got an infection, according to the Third Amended Complaint. See [DE 31]. Moreover, the only time the word "death" even appears in the Third Amended Complaint  is in the context of "death threats" Plaintiff received, relating to the allegations against the FDOC co-defendants. [DE 31 at ¶¶104c, 108b].

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Rule 401, Federal Rules of Evidence. Even if there was an increase in inmate deaths generally, it certainly does not (a) make it more probable Wexford was deliberately indifference in this case especially when (b) Plaintiff did not die, nor suffer infection or any kind of complication from his tiny wounds, nor are there any allegations of death (or increase risk of death) or even infection in the Third Amended Complaint.

As to question 7, regarding changes in severity and mortality inmate-on-inmate assaults, Wexford reiterates its argument from question 6 as the reason it objected. Plaintiff takes issues with the term Wexford used that it "does not recall any studies that have been done" on the issue. Wexford hereby withdraws that term and confirms it has conducted a reasonable inquiry necessary to respond to that interrogatory.

**Questions 8, 10**

In questions 8 and 10, Plaintiff seeks comprehensive detail of the protocol for documentation and treatment of stab wounds. Wexford answered that it does not have its own protocol, but was bound to follow the FDOC Office of Health Services Abrasion Laceration Protocol. Specifically, Protocol Form DC4-683V which is an FDOC issued, check-the-box/ fill-in-the-blank form used throughout Florida prisons. Plaintiff takes issue that Wexford did not describe the protocol and referred to "undifferentiated records."

Wexford has answered these questions to the best of its ability. Under Rule 33(d) of the Federal Rules of Civil Procedure, a party may refer to records when answering an interrogatory if those records are clearly identified and if "deriving or ascertaining the answers will be substantially the same for either party." Id. That is what Wexford has done here. This form is not hidden away, buried in thousands of pages—but the most prominent piece of evidence in this case as it was used by medical personnel for their care and treatment of Plaintiff for the two injuries upon which Plaintiff founds this lawsuit.

**Question 9**

In question 9, Plaintiff seeks a list of a list of physicians, ARNP, PA, Health Services Administrator, and Director of Nursing at Charlotte CI from 2015 to June 2017. Wexford objected on the grounds that the question was overly broad and sought information irrelevant, and outside the scope of discovery. The Health

Services Administrator, for example, who worked at Charlotte CI in 2015 making sure they were stocked up on Motrin (and may have left in 2016), has no relevance to Plaintiff's treatment in January and April of 2017—the basis of this lawsuit.

Wexford pointed Plaintiff to medical records produced in discovery which clearly show who was involved in Plaintiff's medical care for the time frame requested, in keeping with Rule 33(d) of the Federal Rules of Civil Procedure. Plaintiff takes exception to the records reference in that they are "thousands of pages of undifferentiated records." To be clear, these are Plaintiff's own medical records, from which he bases a federal lawsuit against the Wexford Defendants. Plaintiff is familiar enough with his own records, be it 31 pages or 5,458 pages that he could extract the sought after information as easily as Wexford.  Moreover, to be clear, the medical records for Plaintiff's treatment in January and April 2017 (the basis of this lawsuit) are only 31 pages. See [DE 130, 140, 141]. The 31 pages of medical records were filed under seal in support of the Wexford Defendants' Motions for Summary Judgment. Id.

**Question 11**

In question 11, Plaintiff seeks a description of how inmate health care grievances were handled. Wexford objected on grounds of relevance and the question calling for information outside the scope of discovery. Plaintiff takes issue that the objection is boilerplate. Wexford objected because Plaintiff is not

suing the Wexford Defendants for how they handled healthcare grievances. The word "grievance" appears only three times in the Third Amended Complaint [DE 31], none of which refer even remotely to the Wexford Defendants. See [DE 31] at ¶ 31 (seeking protective management); ¶ 34 (requesting protection); ¶ 61 (informing Warden of concerns for his safety). None of these are medical issues. Rather, they are issues relating to allegations against the FDOC co-defendants failure to protect Plaintiff in this matter.

Plaintiff takes issue with Wexford's use of the term "to the extent the procedure can be recollected." Wexford hereby withdraws that term and confirms it has conducted a reasonable inquiry necessary to respond to that interrogatory.

**Question 12**

In question 12, Plaintiff seeks detail of how stab wounds are treated within the hairline. Wexford objected on grounds of vagueness and ambiguity. Namely, there are innumerable scenarios based upon location "within the hairline," the kind of stabbing implement, the severity of the stab wound(s), and any particular issues the individual patient may have. As such, Defendant, Dr. Ozual assisted in answering this question using the care and treatment of Plaintiff as a specific example within the innumerable scenarios this vague and ambiguous question encompassed.

**Question 16**

In question 16, Plaintiff seeks "comprehensive detail what was done to remedy inadequacies at those facilities of the conditions that were found to require corrective action." Plaintiff attached a number of exhibits to the request—the same incorporated into his Requests for Admission served on the same date and responded to simultaneously the Wexford.

Wexford objected to the mirror Request for Admission as irrelevant, outside the scope of discovery for the following reasons, which it incorporates now in response as follows: Exhibit 3(a) regarding Charlotte CI appears to be from a physical survey done in April 2015, approximately two years before the January 29, 2017 and April 26, 2017 alleged incidents which give rise to the instant lawsuit. Exhibit 3(b) regarding Dade CI appears to be from a physical survey done in November 2017, approximately two years before the alleged incidents in this case. Exhibit 3(c) appears to be from a November 2013 physical survey of Martin CI, approximately 4 years before the alleged incidents in this case. Exhibit 3(d) appear to be from a November 2016 physical survey of Martin CI, approximately 3 months before the alleged incidents in this case. With the exception of the Charlotte CI survey, the others involve prison facilities which are not a subject of this lawsuit.  Further, the majority of the surveys were done years before the alleged incidents in this lawsuit. The allegations in this case against the Wexford Defendants are, in sum, that Plaintiff's stab wounds from January 29, 2017 and

April 26, 2017 were not appropriately treated. Nowhere, in <u>any</u> of the aforementioned surveys, does the word "wound" even appear.

## B. Defendant, Wexford's Responses to Plaintiff's Requests for Production

Plaintiff served Wexford with 25 Requests for Production ("RFP's"). Plaintiff now argues that Wexford has not provided sufficient responses to RFP 9, 12, 13, 15, 17, 18, 21, 22, 23, 24, or 25:

> 9. Wexford Staffing Plans (Staffing Matrices) for Charlotte C.I., Dade C.I., and Martin C.I. at the time of the matter sued upon.
>
> 12. All correspondence and reports between Wexford and FDC relating to audits and criticisms of Wexford's provision of medical and mental health care to inmates, including e-mails.
>
> 13. All cost, per-diem, or pricing matrices, or data submitted by Wexford in connection with the FDC contract or contract amendments or any audits or reports mandated by contracts.
>
> 15. A copy of Wexford's infection manual.
>
> 17. All materials detailing the protocol for treating stab wounds, including all materials detailing the protocols for wound care and cleaning.
>
> 18. Employment applications, employee evaluations, and employee corrective action (including re-training and discipline) for Andres Ozual, MD, Karen Blankenship, ARNP, and Carolyn Nies, RN and C. Johnson (nurse).
>
> 21. All documents outlining policy or procedure in responding to inmate complaints or requests for medical

care, written or verbal at Charlotte C.I. from 5/5/2015 through 3/1/2018.

22. Wexford employee rosters and work schedules for January through April 2017.

23. Unredacted copies of the records attached as Exhibit 5a and 5b.

24. If any documents responsive to these requests for production have been lost or destroyed, including by intentional purging of files, describe the nature of the documents destroyed, any applicable purge schedules, and an affidavit certifying destruction of the documents.

25. PRIVILEGE LOG. A list of all documents which are being withheld from production by virtue of any privilege of non-production or for any other reason (this list should identify each document by its name, date, author and recipient and specify the reason for withholding it from production.) The log should define or designate the documents in Wexford's response with sufficient particularity to allow Plaintiffs to make a motion for a court order to require production of these documents.

**RFP 9**

In RFP 9, Plaintiff seeks staffing plans for Charlotte CI, Dade CI, and Martin CI. Wexford objected that the RFP was irrelevant, outside the scope of discovery, and overly broad. Plaintiff's allegations against the Wexford Defendants stem from their care and treatment at Charlotte CI during an approximate five month period from January through April 2017. Wexford would further rely upon its response to Question 9 above.

**RFP 12**

In RFP 12, Plaintiff seeks all correspondence (including emails) and reports between Wexford and FDC relating to audits and criticisms of Wexford's medical and mental healthcare to inmates. Wexford objected that the RFP was irrelevant, outside the scope of discovery, and overly broad. Wexford's contract was approximately 4 ½ years long, involved numerous audits, and much correspondence. As previously argued in question 16 above, nowhere in any of the surveys, does the word "wound" even appear Further, there are absolutely no causes of action against the Wexford Defendants relating to mental healthcare— but Plaintiff seeks that as well.

**RFP 13**

In RFP 13, Plaintiff seeks pricing information. Wexford objected that the RFP was irrelevant, outside the scope of discovery, and overly broad. Wexford relies upon its response to question 2 above.

**RFP 15**

In RFP 15, Plaintiff seeks a copy of Wexford's infection manual. Wexford objected that it the request was irrelevant and outside the scope of discovery.  To be clear, Plaintiff never suffered from an infection as a result of the January or April 2017 stabbing incidents and the Wexford Defendants' care and treatment of him; nor was an infection ever alleged in the Third Amended Complaint.

Moreover, Wexford was required, by contract, to abide by FDOC's Health Services Bulletins for their infection prevention and treatment protocol. Even if Wexford had an infection manual, it would not be utilized in Florida, per the Wexford/ FDOC contract.

**RFP 17**

In RFP 17, Plaintiff seeks all materials detailing the protocol for treating stab wounds. As stated in RFP 15 above, Wexford was bound to follow the FDOC's Health Service's Bulletins. Wexford would supplement its response to RFP 17 to include that it used  FDOC Office of Health Services Abrasion Laceration Protocol.  Specifically, Protocol Form DC4-683V. This form is found in medical records of Plaintiff previously provided to Plaintiff in discovery.

**RFP 18**

In RFP 18, Plaintiff seeks the personnel file of the Individual Medical Defendants and one non-party[2]. Wexford objected that the request sought confidential information, was irrelevant, and overly broad. As to non-party "C. Johnson", "Federal courts recognize that personnel files contain private information and that they should exercise caution in permitting the discovery of information which may embarrass non-party employees." PETA, Inc. v. Dade City's Wild Things, Inc., Case No. 8:16-cv-2899, 2017 WL 4410111 at *5 (M.D.

---

[2] None of the Individual Medical Defendants or non-party "C. Johnson" are current Wexford employees.

Fla. Oct. 4, 2017). As to the Individual Medical Defendants personnel files, "[t]he party seeking discovery may only obtain information directly relevant to the claims at issue." Id. citing GEICO v. Prushansky, Case No. 12-80556-CV, 2013 WL 499382, at *3 (S.D. Fla. June 4, 2013) ("The request seeks highly personal and confidential information for which [Plaintiff] has not established any legitimate need. Further, the need to protect constitutional privacy rights inherent in personnel files outweighs the need for such discovery under the facts of this case."). As such, Wexford is amendable to providing those portions of the Individual Medical Defendants' personnel files that reflect discipline and/ or corrective action for denial or delay of care relating to stab wounds, in keeping with the allegations against them in the Third Amended Complaint. See [DE 31 ¶ 121].

**RFP 21**

In RFP 21, Plaintiff seeks documents outlining policy and procedure in responding to inmate complaints (grievances) for medical care at Charlotte CI from May 2015 to March 2018. Wexford objected that the request was irrelevant, overly broad, and outside the scope of discovery. Plaintiff's allegations against the Wexford Defendants stem from a January and April 2017 stabbing incidents. Additionally, Wexford relies upon its response to Question 11, above, that Plaintiff's allegations against Wexford do not involve their handling of grievances.

**RFP 22**

In RFP 22, Plaintiff seeks Wexford's employee rosters and work schedules. Wexford relies upon its response to Question 9 above.

**RFP 23**

In RFP 23, Plaintiff seeks unredacted copies of two exhibits. Wexford objected as follows: "Objection, irrelevant, outside the scope of discovery at to Exhibit 5(a). Specifically, this record appears to be from Martin CI, another prison facility than the subject of this case (Charlotte CI). Further, the date (April 16, 2017) appears to be over a week before the April 26, 2017 alleged incident and approximately 3 months after the January 29, 2017 incidents which give rise to this lawsuit. Objection, irrelevant, outside the scope of discovery as to 5(b). This exhibit, which is purported by Plaintiff's counsel to be a Transfer Summary (redacted), is so heavily redacted and/ or poorly reproduced, it contains no indication of an author, date, or whether Martin CI is the transferor or transferee. Moreover, most of the first column is cutoff which make the contents of that column unintelligible. As to both exhibits, objection, unduly burdensome. Wexford has produced 5,485 pages of FDOC medical documents to Plaintiff's counsel who can just as easily sift through them in an attempt to locate the requested information."

Plaintiff and Wexford have the same 5,485 pages of Plaintiff's FDOC medical records. Wexford is not in "the unique possession" as Plaintiff contends in

his Motion. Wexford was not the custodian of records when the records were obtained. Wexford's contract ended in 2017. Additionally, the medical provider for whatever prison Plaintiff is housed becomes the custodian of records of Plaintiff's medical files. Thus, as soon as he left a "Wexford" facility, another medical provider (most likely Centurion) became the custodian of records. In sum, Plaintiff is asking Wexford to go through 5,485 pages of records to find the unredacted version of these two exhibits—the same 5,485 pages that Plaintiff possesses.

**RFP 24**

In RFP 24, which appears more as in interrogatory, Plaintiff seeks information about destruction or loss of documents responsive to the RFP's. Wexford responded that information regarding loss or destruction of any documents was unknown. Plaintiff argues only "Defendant has the burden of reasonable investigation." In response, Wexford reasonably investigated, which it assumed was implied in all of its discovery responses.

**RFP 25**

In RFP 25, Plaintiff seeks a privilege log for any documents not produced because of privilege. Wexford responded "Not applicable at this juncture." This was an oversight. Wexford withheld production in RFP 18 of three employees'

personnel files.  Wexford will supplement its response to include a privilege log accordingly.

## C. Defendant, Wexford's Responses to Plaintiff's Requests for Admission

Plaintiff served Wexford with 25 Requests for Admission ("RFA's"). Plaintiff now argues that Wexford has not provided sufficient responses to RFA 9, 10, 11, 13, 14, 15, 21, 22, 23, or 25:

> 9. On April 27, 2017 ARNP Blankenship did not complete the mandatory sections of the Health Information Transfer/Arrival Summary document.
>
> 10. Wexford took no corrective action as to its staff relating to Plaintiff's treatment.
>
> 11. Under its FDC contract, Wexford was paid in advance for the health care rendered.
>
> 13. Wexford has had problems in other states relating to vacant staff positions.
>
> 14. Wexford frequently had staff shortages at Charlotte C.I.
>
> 15. FDC failed to adopt an Electronic Health Record system during Wexford's contract.
>
> 21. During Wexford's contract at Charlotte C.I., security staff often refused to remove confinement inmates from their cells for medical examinations in their housing area.
>
> 22. At times during Wexford's contract with the Florida Department of Corrections (FDC), FDC did not permit medical staff to administer narcotic pain relievers at some prisons.

23. At times during Wexford's contract with the Florida Department of Corrections (FDC), FDC did not permit medical staff to administer narcotic pain relievers at Charlotte C.I.

25. At times during Wexford's contract with FDC, Wexford was not free to provide inmates with HCV with Direct-Acting Antiviral (DAA) drugs even when such drugs were needed to prevent serious liver damage.

**RFA 9**

In RFA 9, Plaintiff seeks to have Wexford admit that Defendant, Blankenship did not complete "mandatory" sections of a document Plaintiff failed to attach as an exhibit. In response, "Wexford Defendants assert lack of knowledge or information as the reason for failing to admit or deny as it has made a reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny. Specifically, no (intelligible) exhibit of any Transfer/ Arrival Summary document has been attached to these Requests."

Wexford's response was based upon Rule 36(a)(4), Federal Rules of Civil Procedure which states, that "the answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." More specifically, Wexford reviewed the 5,485 pages of medical records and is unable to discern what document Plaintiff is referring to. Moreover, Plaintiff has not defined what "mandatory sections" means.

**RFA 10**

In RFA 10, Plaintiff seeks to have Wexford admit it took no corrective action as to its staff relating to Plaintiff's treatment. Wexford objected because the question is vague and confusing in keeping with Rule 36(a)(5), Federal Rules of Civil Procedure. The term "corrective action" assumes that Wexford's employees did something wrong, which they contest.

**RFA 11**

In RFA 11, Plaintiff seeks to have Wexford admit it was paid in advance for health care rendered. Wexford objected that the request was irrelevant, outside the scope of discovery. Wexford incorporates its response for question 2, above.

**RFA 13, 14**

In RFA 13 and 14, Plaintiff seeks to have Wexford admit it had "problems" in other states and Charlotte CI with staffing vacancies and shortages. Wexford objected that the request was irrelevant, outside the scope of discovery. The objection is based on there being no allegations in the Third Amended Complaint [DE 31] that any staff vacancies or shortages caused Plaintiff any harm.  Moreover, it is wholly irrelevant to this case that Wexford, hypothetically, had a phlebotomist position it could not immediately fill, for a prison in West Virginia, ten years ago.

**RFA 15**

In RFA 15, Plaintiff seeks to have Wexford admit it "failed to adopt" an Electronic Health Record system in Florida. Wexford objected that the request was irrelevant, outside the scope of discovery. The Third Amended Complaint [DE 31] contains absolutely no mention, let alone allegation, regarding Electronic Health Record systems.

**RFA 21**

In RFA 21, Plaintiff seeks to have Wexford admit that security staff "often refused to remove confinement inmates from their cells for medical examinations." Wexford objected that the request was irrelevant, outside the scope of discovery. The Third Amended Complaint [DE 31] contains absolutely no mention, let alone allegation, regarding confinement inmates not being removed by security staff for medical examinations.

**RFA 22, 23**

In RFA 22 and 23, Plaintiff seeks to have Wexford admit that FDOC did not permit medical staff to administer narcotic pain relievers "at some prisons" and at Charlotte CI. Wexford objected that the request was irrelevant, outside the scope of discovery. The Third Amended Complaint [DE 31] contains absolutely no allegation that Plaintiff was denied specifically "narcotic pain relievers." In fact, the word "narcotic" does not appear anywhere in the Third Amended Complaint. See [DE 31].

**RFA 25**

In RFA 25, Plaintiff seeks to have Wexford admit that it "was not free to provide inmates with HCV [Hepatitis C Virus] with Direct-Acting Antiviral (DAA) drugs even when such drugs were needed to prevent serious liver damage." Wexford objected that the request was irrelevant, outside the scope of discovery. This case has absolutely nothing to do with Hepatitis C or Direct-Acting Antivirals.

Plaintiff admits in his Motion that "Plaintiff does not suffer from HCV" but then argues that somehow the RFA is relevant to the "systemic nature of medical failure" alleged in the Third Amended Complaint. [DE 167 at p. 20]. It defies logic to think that Wexford's hypothetical failure to provide an HCV patient with stage F1 liver fibrosis (the mildest stage) with a $75,000 dose of Direct Acting Antivirals is relevant to its alleged failure to shave Plaintiff's hair to better visualize his 1 centimeter scalp laceration as alleged in this lawsuit.

**III. Conclusion**

For the foregoing reasons, Plaintiff's Motion [DE 167] should be denied.

**<u>CERTIFICATE OF SERVICE</u>**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was E-filed with the Clerk of Court through the CM/ECF system on **April 12, 2021**.

CHIMPOULIS & HUNTER, P.A.
Attorneys for Defs/WEXFORD HEALTH
SOURCES, INC./ ANDRES OZUAL/ KAREN
BLANKENSHIP, and CAROLYN NIES
150 South Pine Island Road - Suite 510
Plantation, FL  33324
Phone: (954) 463-0033 / FAX:  (954) 463-9562


BY:   /s/ Alexander Dombrowsky
Email adombrowsky@chimpoulishunter.com
ALEXANDER  DOMBROWSKY, ESQ.
Florida Bar No.:  186260
Email khunter@chimpoulishunter.com
M. KATHERINE HUNTER, ESQUIRE
Florida Bar No.:  981877